IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

- - -

ASTELLAS US LLC; ASTELLAS          :    CIVIL ACTION
PHARMA US, INC.; and GILEAD        :
SCIENCES, INC.,                    :
                                   :
                Plaintiffs,        :
                                   :
        vs.                        :
                                   :
                                   :
APOTEX INC., et al.,               :
                                   :
                Defendants.        :    NO. 18-1675-CFC

- - -

                                   Wilmington, Delaware
                                   Thursday, March 5, 2020
                                   10:06 o'clock, a.m.

- - -

BEFORE:   HONORABLE COLM F. CONNOLLY, U.S.D.C.J.

- - -

APPEARANCES:

       FISH & RICHARDSON P.C.
       BY:  ROBERT M. OAKES, ESQ.


          -and-


       WILMER CUTLER PICKERING HALE AND DOOR LLP
       BY:  AMY K. WIGMORE, ESQ. and
           BRITTANY AMADI, ESQ.
           (Washington, D.C.)


          -and-


       WILMER CUTLER PICKERING HALE AND DOOR LLP
       BY:  EMILY R. WHELAN, ESQ.,
           KEVIN M. YURKERWICH, ESQ. and
           ALISON BURTON, ESQ.
           (Boston, Massachusetts)



           Counsel for Plaintiffs
           Astellas US LLC and Astellas Pharma US,
           Inc.



       MAYER BROWN LLP
       BY:  LISA M. FERRI, ESQ. and
           MANUEL J. VELEZ, ESQ.
           (New York, New York)


           Counsel for Plaintiff
           Gilead Sciences, Inc.

APPEARANCES (Continued):

PHILLIPS, GOLDMAN, McLAUGHLIN & HALL, P.A.
BY:  MEGAN C. HANEY, ESQ.


-and-


RAKOCZY MOLINO MAZZOCHI & SIWIK
BY:  WILLIAM A. RAKOCZY, ESQ.,
     JOSEPH T. JAROS, ESQ.,
     CHRIS P. GALLIGAN, ESQ. and
     CYNTHIA SUN, ESQ.
     (Chicago, Illinois)


     Counsel for Apotex/DRL



MORRIS JAMES LLP
BY:  KENNETH L. DORSNEY, ESQ.


        -and-


KRATZ & BARRY LLP
BY:  GEORGE J. BARRY III ESQ.
     (Atlanta, Georgia)


     Counsel for Defendant
     Accord Healthcare



YOUNG CONAWAY STARGATT & TAYLOR LLP
BY:  ADAM W. POFF, ESQ.


        -and-

APPEARANCES (Continued):

FREEBORN & PETERS
BY:  STEPHEN BENSON, ESQ. and
     DAVID KNAPP, ESQ.
     (New York, New York)


     Counsel for Defendant
     Sun


POTTER, ANDERSON & CORROON LLP
BY:  DAVID E. MOORE, ESQ.


     Counsel for Defendants
     Wockhardt Bio AG and Wockhardt USA LLC

- - -

5

**P R O C E E D I N G S**

(Proceedings commenced in the courtroom, beginning at 10:06 a.m.)

THE COURT: All right. Good morning. Please be seated.

Mr. Oakes?

MR. OAKES: Good morning, Your Honor. Bob Oakes on Behalf of Fish & Richardson for the plaintiffs.

With me this morning for Astellas is Amy Wigmore, Amy Emily Whelan, Brittany Amadi, Kevin Yurkerwich and Allison Burton.

Also representing Gilead is Lisa Ferri and Manuel Velez, and also with us this morning is Andrea Tiglio, who is general counsel of intellectual property for Astellas.

THE COURT: All right. Thank you. Ms. Haney?

MS. HANEY: Good morning, Your Honor. Megan Haney from Phillips Goldman on behalf of Apotex and DRL, and I'm joined today by Joe Jaros, Bill Rakoczy, Chris Galligan and Cynthia Sun, and they're all from Rakoczy.

THE COURT: Okay. Thank you.

MS. HANEY: And I also have Omar Jabri from Apotex and Malli Rao and Jeff Martin from DRL.

THE COURT: Great. Thank you very much.

Mr. Dorsney?

MR. DORSNEY: Good morning, Your Honor. Ken Dorsney from Morris James on behalf of Accord, and with me I have George Barry from Craft & Barry.

MR. BARRY: Good morning, Your Honor.

THE COURT: All right. And Mr. Poff?

MR. POFF: Good morning, Your Honor. Adam Poff from Young Conaway on behalf of Sun, and with me from Freeborn & Peters, Stephen Benson and David Knapp.

THE COURT: All right. And Mr. Moore?

MR. MOORE: Good morning, Your Honor.

THE COURT: Good morning.

MR. MOORE: David Moore from Potter Anderson on behalf of the Wockhardt defendants.

THE COURT: All right. I've received the briefs. The first term, I don't believe any construction is necessary. This is monohydrate. Basically, both sides want to import limitations. Plaintiffs want to import approximately. Defendants want to import the stoichiometric language and crystal structure.

I don't see anything in the claim language that would support either proposed construction by the parties, so I will hear you very briefly. I think we need to get to the other terms that I do have questions about.

All right. So with that in mind, if we could have very brief presentations, if you would like.

MS. WIGMORE: Your Honor, Amy Wigmore for the plaintiffs. I will be handing up some slides and Ms. Whelan will address the first term. If I may approach?

THE COURT: Please.

(Ms. Wigmore handed slides to the Court.)

MS. WIGMORE: And just for clarification, Your Honor, Ms. Whelan and I represent the Astellas plaintiffs.

THE COURT: All right.

MS. WIGMORE: Counsel for the Gilead plaintiffs are also in the courtroom today, but Ms. Whelan and I will be presenting on behalf of both plaintiffs today.

THE COURT: All right. Thank you. Good morning.

MS. WHELAN: Good morning, Your Honor. Emily Whelan on behalf of Astellas.

This is a Hatch-Waxman case concerning the drug Lexiscan. Lexiscan is the brand name for the drug regadenoson. It's a stress agent that causes a rapid increase in blood flow around the heart for a short period of time. This helps physicians use imaging agents to take snapshots of the heart which are used to diagnose heart related conditions. For example, stress tests can be used to determine whether a patient may have coronary artery

disease or an irregular heartbeat. These are common cardiovascular conditions that affect large numbers of patients in the United States, and with an appropriate diagnosis, physicians are able to identify appropriate treatment strategies for their patients.

Stress agents like --

THE COURT: Let's go right to the heart of things. Approximately. I'm trying to figure out why we need to add approximately here. How is that going to assist the jury?

MS. WHELAN: So, Your Honor, we think it's important to include approximately because the specification accounts for experimental error in identifying the monohydrate.

THE COURT: Right. So why can't we just have experts present to the fact-finder? Is this a bench trial? This is a Hatch-Waxman, so it's a bench trial. Why can't we have experts present to me what they say would account for experimental error and then I can make a fact-finding?

MS. WHELAN: So we can do that, Your Honor, and plaintiffs originally were comfortable with the plain meaning of monohydrate. However, the defendants have raised this stoichiometric amount.

THE COURT: Right. I will deal with that. I'm very skeptical about that. So actually, this might solve

it.  So if we don't have the stoichiometric limitation that they want to impose, you don't need approximately.  Is that the case?

MS. WHELAN:  As long as it's clear that the experimental error will be accounted for in identifying a monohydrate in the real world.

THE COURT:  But when you say that, I mean, isn't that going to be -- that's going to come from the experts.  I mean, maybe they have an expert who says, no, there is no experimental error.  I don't care what the patent says.  There's no such thing as experimental error.  And then I would weigh it.  But I mean I don't know how to prevent your expert from testifying that this is or this is not infringement and the test results show why, and that accounts for an experimental error.  I mean --

MS. WHELAN:  Yes.  That's what we expect our experts will address.

THE COURT:  Okay.

MS. WHELAN:  So as long as it's clear that the claim construction is allowing for that and for the way that experts will interpret a monohydrate as identified in the real world so plaintiffs will be comfortable.

THE COURT:  Okay.  So let's hear from the defense.  Thank you.

All right.  How is stoichiometric going to help

me make a fact-finding?

MR. JAROS: Good morning, Your Honor.

THE COURT: Good morning.

MR. JAROS: Joe Jaros on behalf of Apotex and DRL.

THE COURT: All right.

MR. JAROS: Your Honor, it's consistent with the intrinsic record. This is slide 9. This is from the prosecution history of a patent that led to all of these asserted patents.

In the intrinsic record, the monohydrate is identified as a hydrate with a one-to-one stoichiometric ratio.

THE COURT: Where does it say stoichiometric?

MR. JAROS: It is the one-to-one ratio presented there.

THE COURT: Right.

MR. JAROS: And then the intrinsic evidence --

THE COURT: But you just want to add the word stoichiometric. Why can't we just do one-to-one ratio?

MR. JAROS: We could do that, Your Honor.

THE COURT: Well, plaintiffs are acceptable to that. Right?

MS. WHELAN: Yes, Your Honor, as long as I discussed, that it's clear that there can be experimental

error.

THE COURT: Right. All right. So it's basically a one-to-one ratio. Your expert says it's one-to-one and then you can argue over whether there's experimental error and what that ought to be in determining whether it is, in fact, one-to-one.

MR. JAROS: That's correct, Your Honor.

THE COURT: Okay. So then why don't you construe the term?

MR. JAROS: So if the term is construed consistent with the intrinsic evidence we just presented, then we would submit on slide 38 this Court has previously construed monohydrate to make it clear that that water --

THE COURT: I don't want to go into -- is that the same patent?

MR. JAROS: It is not.

THE COURT: Okay. Is it me?

MR. JAROS: It is not.

THE COURT: Then I don't even want to think about it. Let's just go with the intrinsic evidence that is here.

MR. JAROS: Sure.

THE COURT: So the word stoichiometric isn't in the written description. Correct?

MR. JAROS: Correct.

THE COURT: So why am I going to import language stoichiometric here when the experts can just offer their competing testimony as to whether or not there's a one-to-one ratio?

MR. JAROS: The key dispute between the parties on this term is whether those water molecules must be within a crystal structure or not.

THE COURT: But that's the second term. We'll get to the second limitation, crystal structure. I'm only on stoichiometric. How is the importation of the word stoichiometric going to assist the fact-finder?

MR. JAROS: It's consistent with the intrinsic evidence definition that a monohydrate is a crystal structure as distinguished from a crystalline form.

THE COURT: Okay. So maybe I'm confused. I thought there's essentially two limitations you want as part of your proposed construction. Your proposed construction I thought --

MR. JAROS: It's presented on the screen, Your Honor, in slide 11.

THE COURT: Right. Crystal structure. We'll get to that. Containing a stoichiometric amount.

So the plaintiffs have already just said if we get rid of stoichiometric, then we can have the plaintiffs, both of you present competing testimony as to whether or not

there's a one-to-one ratio. That makes sense to me. Coming into this, I thought that made sense. Why can't you live with that?

MR. JAROS: We can live with our proposal minus the word stoichiometric with the understanding that that is represented in the intrinsic record as a one-to-one ratio.

THE COURT: That seems to me pretty obvious. It's a one-to-one ratio. Plaintiffs don't dispute that. Right? It's a one-to-one ratio? That's the definition of monohydrate. Right?

MS. WHELAN: Right. It's just the experimental error around the one-to-one.

THE COURT: All right. I will get to it in a second, but I'm definitely going to jettison and not accept the defendants' proposal to add the word stoichiometric.

All right. Now we get to crystal structure. Okay.

MR. JAROS: Yes, Your Honor.

THE COURT: So let's talk about that. So the written description talks about non-crystalline forms. Right?

MR. JAROS: It does.

THE COURT: Amorphous forms. Right?

MR. JAROS: Single amorphous material. Correct,

Your Honor.

THE COURT: And there are claims in the patent which expressly describe a crystalline monohydrate. Is that correct?

MR. JAROS: They modify the term monohydrate with crystalline monohydrate.

THE COURT: Correct. They refer to crystalline monohydrate. Correct?

MR. JAROS: Correct.

THE COURT: You agree, do you not, that crystalline means crystalline form. Is that correct? Crystal form? The words crystalline. In other words, if it says crystalline monohydrate, that must be a monohydrate in a crystal form. Right?

MR. JAROS: We do not agree with that, Your Honor.

THE COURT: Really? Okay. So give me an example of a crystalline monohydrate that is not a crystal structure.

MR. JAROS: We are -- we are mixing two different concepts.

THE COURT: Okay.

MR. JAROS: So the term monohydrate standing alone refers to a crystal structure. That's the ordinary and customary meaning presented on slide 11.

THE COURT: Right.

MR. JAROS: Is a crystal structure, and we've provided diagrams of what that will look like.

THE COURT: Right.

MR. JAROS: So you are looking at a monohydrate crystal structure because you can see the molecule. It's a one-to-one ratio.

THE COURT: Okay.

MR. JAROS: The claims here distinguish the monohydrate of the compound, which is analogous to what we are looking at in slide 15 and consistent with the intrinsic record of the one-to-one ratio in a crystalline form. So you are talking about that crystal structure and then the separate term crystalline form refers to crystalline material.

And you could have a mixture. For example, you could have a 50 percent amorphous, 50 percent crystalline monohydrate mixture. The claim that's directed only to monohydrate would be satisfied because you would have a crystal structure present.

THE COURT: All right. Let me give you an example. Let's look at the '183 patent. So if I'm looking at column 19 of claim 1, the language, "which monohydrate is in a crystalline form," end of quote.

MR. JAROS: Yes.

THE COURT: What does crystalline form mean in that context?

MR. JAROS: We are proposing that means which monohydrate structure is in a crystalline material. So it's the repetition --

THE COURT: Hold on.

MR. JAROS: Sorry.

THE COURT: Where is that in your brief?

MR. JAROS: I believe it's in the crystalline form section, Your Honor.

THE COURT: If you would just point me to the page, I would appreciate it.

MR. JAROS: Okay. Page 39, at the top, Your Honor.

THE COURT: All right. Hold up. Okay. All right.

So what is the crystalline material here in claim 1?

MR. JAROS: We have the claims of the '183, all of them presented on slide 42.

THE COURT: Right.

MR. JAROS: The crystalline form refers to the crystalline material, and then you see the structure of the claims, Your Honor. Two, three, four, five are all giving you further information about that crystalline material. So

you have the monohydrate structure of claim 1, wherein the crystalline material has an X-ray diffraction pattern as shown in Figure 3, and it continues.

So the monohydrate is very broad. It requires only the crystal structure. All of the subsequent claims require analysis of the material itself. So they can prove infringement by finding the structure of the material. They need not tell you anything else about that material. The additional claims provide you additional information about the material itself.

And one way to think about it is the crystalline material is a repetition of that crystalline structure. It could be ten percent of the material. It could be 90 percent of the material, but the material itself contains the crystal structure.

THE COURT: I have a hard time understanding that. I mean, it seems to me when it says which monohydrate is in a crystalline form means the monohydrate itself is in a crystalline form.

What's the difference between crystalline form and crystal structure?

MR. JAROS: So the crystal structure as represented in the intrinsic evidence is that orientation of molecules in a one-to-one ratio. It's called the unit cell. It contains a defined number of molecules of the drug and

the water.

If you look on slide 24, Your Honor --

THE COURT: So actually, just generally, just tell me. What is the difference between crystalline form and a crystal structure? Just generally. I don't want to know it in the context of the patent. What does crystalline form mean?

MR. JAROS: Crystalline form almost always refers to the bulk crystalline material. It's the pile of powder.

THE COURT: Show me in the patent where the patent distinguishes crystalline form from crystal structure.

MR. JAROS: It's the claim structure itself that we just looked at, Your Honor.

THE COURT: Is there anything in the written description that distinguishes crystalline form from crystal structure?

MR. JAROS: The description does not distinguish those terms. It identifies the monohydrate crystal structure by an XRPD pattern, and then they further characterize the bulk material by saying it's free of a chemical or free of other polymorphic forms.

THE COURT: And just so I understand, the plaintiff's position, right, is that crystal structure

means, and is synonymous with crystalline form. Is that right? Maybe not.

MS. WHELAN: Your Honor, we certainly don't agree with the distinction that the defendants are attempting to bring here.

THE COURT: Right.

MS. WHELAN: These terms crystal structure and crystalline material are not in the claims.

THE COURT: That's not my question. My question is, just in the abstract, first of all, crystalline form, is that synonymous with crystal structure?

MS. WHELAN: So I guess I'm not prepared to absolutely agree with that today given the distinctions the defendants are attempting to derive here.

THE COURT: Well, what did you think coming into this hearing?

MS. WHELAN: Well, coming in, I guess it didn't appear to us that that was a necessary distinction to be disputed here because those terms aren't used in the claims. We think that, as we'll discuss in the next term, crystalline form should get its ordinary meaning.

THE COURT: Right.

MS. WHELAN: Which involves the molecules being arranged in a regular repeating pattern. But in terms of whether crystalline should be read into monohydrate, we

don't think that the distinction the defendants are attempting to put forward is informative for that and that it's clear from the claims themselves that crystalline should not be read into the word monohydrate.

THE COURT: So maybe I'm obtuse, I'm not getting something basic here. If something is in crystalline form, does it have a crystal structure?

MS. WHELAN: Yes.

THE COURT: Is there ever occasion when something is in crystalline form that it doesn't have crystal structure?

MS. WHELAN: Not that I'm aware of, Your Honor.

THE COURT: So am I wrong to assume from your briefs that you were treating them essentially interchangeably? Crystalline form needs to have a crystalline structure. I might be missing something big. I thought you were going to immediately say, yes, of course, they're the same thing. I must be missing something.

MS. WHELAN: So I think you're correct, that we haven't attempted to draw a distinction because we didn't think it was necessary for purposes of the disputed claim construction issues, but in view of the arguments defendants are making, I'm hesitant to say that there could never be a distinction that one would want to draw if it's just here.

In terms of whether crystalline should be read

into monohydrate, I don't think that would be relevant.

THE COURT: Is there any space between the crystalline monohydrate and a monohydrate with a crystal structure or are they exactly the same thing?

MS. WHELAN: I think in these claims, when it says a crystalline monohydrate, it means the monohydrate has a crystal structure, yes.

THE COURT: But only because it's in the claims. You are saying if I asked a scientist, pulled a scientist off the street and say, hey, I've got a crystalline monohydrate here, that if I also said I have a crystal, a monohydrate with a crystal structure, that scientist might think I'm talking about two different things?

MS. WHELAN: I think they would think it was the same.

THE COURT: That's what I thought your position was when I read the briefs, but you seem to hedge, which is giving me pause.

MS. WHELAN: The only reason I'm hedging is because we disagree with the distinction the defendants are trying to draw with respect to these claims, but it's unclear what further implications they may be trying to get at.

THE COURT: You made an argument that I found very persuasive in the briefs, that the importation of this

crystal structure language would render claim language superfluous, and in particular you pointed to claim 1 of the '183 patent, you pointed to claim 1 of the '301 patent and you pointed to claim 11 of the '301 patent. And you pointed specifically to the crystalline adjective used to describe monohydrate in those claims.

MS. WHELAN: That's correct.

THE COURT: That's what you said was superfluous, which led me to believe that it is superfluous because crystal structure and crystalline are the exact same thing.

MS. WHELAN: Yes, that's the argument.

THE COURT: Which you seem to be backtracking off of now, because when I asked you the simple question, aren't they synonymous, you didn't just say, they're synonymous. That's the purpose of our brief. I thought that was the whole purpose of your claim differentiation argument, which coming into this hearing I thought was very compelling. But am I missing something?

MS. WHELAN: No. You're correct, Your Honor. I thought that you were asking about different words that the defendants were using that are not in the claims.

THE COURT: I agree crystalline material, I don't see that in the claim, but what I do see in the claim is crystalline.

MS. WHELAN: Yes.

THE COURT: And I thought the whole reason why your argument was so persuasive was, well, then therefore if you wanted to add crystalline structure to discuss every monohydrate that is mentioned in the patent, you're going to render superfluous claims that refer to a crystalline monohydrate.

MS. WHELAN: That is correct.

THE COURT: And that was why I was prepared to adopt your construction.

MS. WHELAN: Yes. That's exactly right, Your Honor. The responses earlier were dealing with the different words that the defendants are using.

THE COURT: All right. I'm not going to adopt the defendants' construction for the following reasons. I think the claim language confirms it would be inappropriate to limit the term monohydrate to a crystal structure. Some but not all of the claims that recite a monohydrate require the monohydrate to be crystalline. The defendants' importation of the crystal structure to define monohydrate would render that language superfluous, and specifically it would render crystalline language in claim 1 of the '183 patent, claim 1 of the '301 patent, and claim 11 of the '301 patent. Also, the fact that in some cases, the claim recites monohydrate, and then in other instances it recites

crystalline monohydrate shows that the patentee knew how to limit a monohydrate to a crystalline or crystal structure when the patentee wanted to do so.

And then, lastly, the written description speaks of monohydrate as being in crystalline form and being an amorphous product, and I refer you to the '301 patent, column 6, lines 54 through 57.

So I don't believe construction is necessary of this term. I am going to say it has a plain and ordinary meaning and the experts can quibble over what the margin of error is at trial. All right? All right. So now let's go to the next term.

MR. JAROS: Your Honor, can I make one point on monohydrate?

THE COURT: No, you can't, because I've read the briefs really carefully. I really am taken aback by some of the oral argument here by plaintiffs, but I'm going to go with the briefs and what the most recent statements are from plaintiffs, and you can make your argument to the Federal Circuit. All right? Thank you. Briefing was very good. I read it carefully before I came in here and I read the patent.

So let's go. I mean, for the same reason I would think no construction would be necessary for crystalline monohydrate, is there any reason why, assuming

I'm adopting, as I am, the rationale I did for the first term limitation, I should rule differently when it comes to the second term limitation?

I will hear from the defense.

MR. JAROS: Yes, Your Honor. Slide 24 --

THE COURT: Okay.

MR. JAROS: -- presents the implication of their proposed construction. As they are reading the claims, as counsel just described, they would read the claims as covering an amorphous liquid and crystalline monohydrate of regadenoson. There's absolutely no description of an amorphous monohydrate or a liquid monohydrate of regadenoson in these patents.

THE COURT: Okay. And that's fair, but there's no question that the written description states expressly that monohydrate could be in amorphous form. Correct?

MR. JAROS: It does not.

THE COURT: Okay. So hold on one second. So on the '301 patent in column 6, line 54, it states, "It has been discovered that this compound is capable of existing in at least three different crystalline forms referred to herein as Form A, Form B, Form C, and an amorphous product."

MR. JAROS: Yes, Your Honor.

THE COURT: Okay. And your point would be the product is bigger than the form of monohydrate?

MR. JAROS: Our point is slightly different.

THE COURT: Okay.

MR. JAROS: When a POSA reads what is presented on slide 26, which is a patent description of amorphous material, the POSA reads it as follows: This polymorph, and they're referring to amorphous as a separate polymorph, distinct from monohydrate, is produced by heating a Form A polymorph called monohydrate at a temperature of up to 200 degrees.

Figure 2 tells you what happens when you heat the monohydrate to 200 degrees. You vaporize the water. It's a dry powder. That is the definition of amorphous material. You have cooked the water out of it. There's nothing left, so it cannot be a hydrate of any kind and it certainly cannot be a monohydrate.

THE COURT: Amorphous material could be a hydrate as a general thing, but you are saying here it can't be because the temperature is so high. Is that right? No?

MR. JAROS: That is not correct.

THE COURT: All right. Say it to me again. Sorry.

MR. JAROS: The ordinary and customary meaning of a hydrate is water incorporated into the crystal structure.

THE COURT: Okay.

MR. JAROS: Amorphous does not have a crystal structure and therefore it cannot incorporate water. In fact, Figure 2 tells you, how do you make amorphous? You remove all the water and you destroy the crystal structure.

THE COURT: But it's impossible to have a hydrate that is amorphous?

MR. JAROS: Please repeat that.

THE COURT: So is the correct conclusion I can infer from this is, is that it's impossible to have an amorphous hydrate?

MR. JAROS: Correct.

THE COURT: Okay. So I shouldn't place any weight then when it -- what is it referring to amorphous product there then on line 56 and 7 of column 6? What is that referring to? Amorphous product?

MR. JAROS: Sorry.

THE COURT: That's all right.

MR. JAROS: Let me look at exactly what you are looking at.

THE COURT: Sure.

MR. JAROS: I apologize, Your Honor. You're at column?

THE COURT: Column 6, lines 56 through 57, the paragraph beginning at line 54.

MR. JAROS: An amorphous product is referring to the bulk material produced by cooking the water out of Form A.

THE COURT: Okay.

MR. JAROS: Your Honor, may we provide the Court with a copy of our slides?

THE COURT: Oh, sure. Please.

(Ms. Haney handed slides to the Court.)

THE COURT: Okay. All right. So then let's talk about, you want to impose the stability limitation for this term. Is that right?

MR. JAROS: Yes, Your Honor.

THE COURT: All right. Why don't you take me through that.

MR. JAROS: Sure. We are now moving to the crystalline form term. Is that okay?

THE COURT: I'm on claim 2. Yes, crystalline monohydrate.

MR. JAROS: So the parties had proposed to proceed in stepwise fashion first with monohydrate, then crystalline form. Apotex's position is crystalline monohydrate and monohydrate and crystalline form are the same for these purposes. If it's okay, I will address the in crystalline form terms.

THE COURT: Sorry. You're saying claim 1 and

claim 2, what we just finished with, you are saying it's the same argument for this? I lost you.

MR. JAROS: Sorry. The crystalline form, the stability of the crystalline form and the crystalline monohydrate, we have treated them together. A POSA would consider those terms interchangeable.

THE COURT: Hold on one second.

MR. JAROS: Your Honor, could I make a proposal?

THE COURT: Just give me one second.

Okay. So when you say the crystalline form terms, so the first term was monohydrate.

MR. JAROS: Correct.

THE COURT: I've already ruled on that.

MR. JAROS: Correct.

THE COURT: The second term is crystalline monohydrate.

MR. JAROS: That was the second term in the briefing. Yesterday the parties agreed to proceed next with crystalline form because it's logical.

THE COURT: Okay. Sorry. Got you. All right. That's fine. Now I understand what you are doing.

So we're going with crystalline form. That's fine. All right.

MR. JAROS: Yes, Your Honor. I have about eight minutes of slides on that.

THE COURT: Fine.

MR. JAROS: Slide 41 presents the competing construction for the term crystalline form.

THE COURT: Yes.

MR. JAROS: Slide 42, these are representative claims of the '183. We mentioned this earlier. Claim 1 is the monohydrate where defendants contend crystalline form refers to the bulk material, and then 2, 3, 4, and 5 tell you more information about that bulk material, the crystalline form.

The parties do agree on the meaning of crystalline itself. Crystalline is an adjective, and as plaintiffs cited in their brief, it refers to a solid morphological form where the atoms or molecules are arranged with a three-dimensional long-range order. That's what we mentioned earlier. That's the repetition of that structure millions of times.

THE COURT: Right.

MR. JAROS: The only dispute is the word stable.

THE COURT: But, wait. Go back.

MR. JAROS: Plaintiffs' words on the left.

THE COURT: Right. All right. And would you define for me, in I way it kind of goes back to the first term, but what's the definition of crystal structure?

MR. JAROS: Crystal structure is the molecules

itself, and to be very technical, it's defined by a unit cell. So the crystal structure would be an individual unit that is repeated millions of times to create a single crystal or a crystalline bulk material.

THE COURT: Okay. All right.

MR. JAROS: Again, from plaintiffs' brief, they cited an extrinsic reference, but it does refer to crystalline material having that three-dimensional long-range order.

THE COURT: Right. They agree with this. This is not in dispute. Correct?

MS. WHELAN: That's correct, Your Honor.

THE COURT: All right.

MR. JAROS: So defendants are proposing we include the word stable.

THE COURT: Right.

MR. JAROS: I will explain why. The description refers to the stable monohydrate. You asked about products earlier. The final product throughout the patent, it's clear it's a bulk material.

THE COURT: Right.

MR. JAROS: That's a pile of powder. Form A has been shown to be a monohydrate. That's the polymorph. That's the crystal structure and it's the most stable of the various polymorphs at ambient temperatures. So that's

telling you the polymorphic structure is stable.

THE COURT: Right. Well, it's telling me it's the most stable.

MR. JAROS: Yes, correct.

THE COURT: It doesn't tell me it's stable, does it?

MR. JAROS: That's true. Stability is relative, but it does tell you exactly how to determine and distinguish the stable polymorph from the unstable polymorphs.

The unstable polymorphs are identified as Form B and Form C. Form B has varying amounts of water. That's called a variable hydrate that's non-stoichiometric. Form C is also a variable hydrate. So these do not have a defined ratio. You have a crystal structure. It is different than the monohydrate crystal structure, but the water can move around. It can assemble differently. It is not a fixed ratio. That's what stoichiometric means, a fixed ratio in crystallization.

Forms B and C are messy. They are called variable hydrates. The hydrates can be all over the map and it can change.

It is unclear based on the briefing whether plaintiff contends that Forms B and C are, in fact, a monohydrate.

THE COURT: Let's ask. Is Form B a monohydrate?

MS. WHELAN: No.

THE COURT: Is Form C a monohydrate?

MS. WHELAN: No, it's not.

THE COURT: Now we know.

MR. JAROS: So here, your Honor, we have what we cited in the briefing, which distinguishes reading in a limitation from characterizing the invention. And if we look at plaintiffs' proposed construction, on the left monohydrate is at the top and then crystalline form is beneath that. If all is required is a chemical substance with one water to one regadenoson in a crystalline form, that can capture Forms B and C. That will capture variable hydrates, because in some cases variable hydrates will have that one-to-one ratio. They won't be stable. They could go up, they could go down, but plaintiffs' proposed construction would capture Forms B and C as well as amorphous.

THE COURT: Where is there lexicography for any definition that says that stable should be part of this definition?

MR. JAROS: If the Court is accepting plaintiffs' proposed construction for these terms, that construction would cover Forms B and C, which they just informed the Court very clearly B and C are not the

monohydrate.  So their construction is so broad, it doesn't require a crystal structure, it doesn't require a ratio.  It will capture B, C, and amorphous.

THE COURT:  All right.  Anything else?

MR. JAROS:  Two quick points, Your Honor.  We just looked at plaintiffs' proposed construction, which captures B, C and amorphous.  We submitted a declaration by Dr. Rogers.

THE COURT:  Wait.  So do I have to resort to extrinsic evidence?

MR. JAROS:  You do not.

THE COURT:  Then let's not talk about it.

MR. JAROS:  Okay.

THE COURT:  If you want me to, I will, but, you know, unless you're telling me I have to resort to extrinsic evidence, let's not talk about it.  I didn't read the declarations because nobody told me in the briefing I had to resort to extrinsic evidence, although you cited stuff, but I ignored it.

MR. JAROS:  Understood.  It's our position that the description is self-explanatory on this.  A is a monohydrate and has a crystal structure and must be characterized as this.  B, C and amorphous are not monohydrates.  So we can rely solely on the intrinsic evidence and that's how a POSA would read it.

THE COURT: All right.

MR. JAROS: Thank you, Your Honor.

THE COURT: Thank you.

MR. BENSON: Your Honor, Stephen Benson on behalf of Sun.

Just for the record, I know that the argument, it seems like there's a little bit of back and forth with a couple of different claim terms, and just for the record, we do believe that the term that doesn't require construction, crystalline form, that a person of ordinary skill in the art is absolutely clear about what that means, and I just want to be clear of our position with respect to that term.

THE COURT: I appreciate that. Actually, just give me a second. Okay. Go ahead.

MS. WHELAN: Thank you, Your Honor. So I just want to be clear that the term we're addressing here is crystalline form and whether stability should be read into crystalline form.

THE COURT: Right.

MS. WHELAN: It appears that defendants were talking about the monohydrate. They seem to be getting more toward infringement and I just want to clarify that they're different claims of different scope here. Some of them talk about compositions that are prepared from a monohydrate or a crystalline monohydrate and whether something that contains

some amount of Form B or Form C could infringe is a question for another day. So my responses before were simply that Form B and Form C in the specification are not identified as a monohydrate.

But coming back to the claim term, so the term is crystalline form, not monohydrate. As Your Honor noted, there is not lexicography or disavowal in the specification that should lead to a stability requirement being read into this term.

As the specification recognizes, stable is a relative and conditioned dependent term. Rather than requiring crystalline forms to be stable, the specification acknowledges the relative stability of the three different crystalline forms, Form A, Form B and Form C, and the stability of each of them also varies depending on the condition.

So Form A is the most stable form at ambient temperature and remains stable under relative humidity stress conditions up to its melting point.

Form B is also a crystalline form. It contains variable amounts of water and is difficult to reliably reproduce.

And Form C is the third specific crystalline form described, and the specification states that at elevated temperatures, it desolvates to an unstable form.

So the specification describes crystalline forms that have different relative stability which depends in each case on the condition.

Form A is becoming unstable in certain humidity and temperature conditions.

Form B has variable amounts of water and is difficult to reliably reproduce.

And Form C desolvates to an unstable form at elevated temperatures. Accordingly, based on the intrinsic record, the crystalline form does not have to be stable and is likely to exhibit varying stability, depending on conditions.

Defendants acknowledge that Forms B and C are not stable. They try to distinguish them because Forms B and C, as they've stated, are not a monohydrate, but the term for construction here is crystalline form, and therefore defendants' concession that Forms B and C are crystalline forms but not stable means stability cannot be a requirement of a crystalline form.

And we also have in intrinsic evidence from the Guillory reference that's cited in the patent record, and it states that unstable crystals form preferentially at lower temperatures. Reinforcing that stability is not a requirement of a crystal, and therefore we think that crystalline form can be interpreted according to its plain

meaning and without reading in a stability requirement.

THE COURT: Okay. Thank you. All right. I agree that crystalline form should be given its plain and ordinary meaning. There's no lexicography in the specification, nothing in the claims or the written description that would limit crystalline to stable crystalline, and rather the term is used, it's very clear from the written description, as a relative term, and Guillory, the prior art, which is in part of the intrinsic evidence that was cited by the specification reinforces that stability is not a requirement of crystalline.

All right. Next term.

MS. WHELAN: Your Honor, we have crystalline monohydrate as the term that would have come before, but I think we've already addressed the stoichiometric amount dispute with respect to monohydrate and the stability dispute with respect to crystalline, so I don't think further argument is necessary unless Your Honor has questions.

THE COURT: I don't from the plaintiffs.

Defendants agree that given my rulings, which I know you object to, but I think that ergo, you know what the term means or not?

MR. JAROS: Yes, Your Honor.

THE COURT: You agree, so then no further

construction is required for that term.

Next term.

MS. WIGMORE: Your Honor --

THE COURT: Actually, just to be clear, the next term is substantially free? That's an indefinite thing. Right?

MS. WIGMORE: No. The next term is a purity -- we have not -- the defendants have not briefed any indefiniteness issues, so I don't believe -- they may have dropped a footnote on that.

THE COURT: Hold up. Okay. I'm referring to the joint claim construction chart.

MS. WIGMORE: Okay.

THE COURT: So on page 11, the term substantially free.

MS. WIGMORE: Yes, Your Honor.

THE COURT: They are contending it's indefinite. All right. And so I'm just going to leave this for another day. We all agree on that?

MS. WIGMORE: That's right.

THE COURT: All right.

MS. WIGMORE: So the next term that would be argued today is a purity of at least 99.6 percent.

THE COURT: Okay. Just hold on a minute. And so I just want to make sure for the record then, other forms

then free up those terms in the claim construction chart, not briefed. We're going to leave them for another day. Correct?

MR. JAROS: The other form terms had been agreed, Your Honor.

THE COURT: Oh, on page 14. Your are right. I forgot. Okay. Then I don't have to do anything. All right. Great.

So then we're on, what I have is the seventh term, purity that leads to about 99.6 percent. That are you going to treat along with the seventh term?

MS. WIGMORE: They are different because the seventh term has a reissue disclaimer argument, so I think that does need to be addressed.

THE COURT: So they do not rise and fall together?

MS. WIGMORE: Not necessarily. We think they have the same construction, but the other side has made a separate argument about that claim term that we would like the opportunity to address.

THE COURT: That's fine. It wasn't clear to me. That's why I had the question.

MS. WIGMORE: Okay.

THE COURT: Okay. So go for it.

MS. WIGMORE: Starting with a purity of at least

about 99.6 percent, this term appears in the '301 patent, claims 8 and 13, and the '883 patent, claim 5. And shown here on slide 35 is an example of how that is used. It is used consistently across the claims as the pharmaceutical composition of a particular independent claim wherein the crystalline monohydrate has a purity of at least about 99.6 percent.

So turning to the next slide, the --

THE COURT: Sorry. Just one second. Okay.

MS. WIGMORE: Slide 36, the constructions of the plaintiffs; and all of the defendants agreed except Sun proposed that it does not need construction. And just to be clear, Your Honor, that was plaintiffs' initial position. And we would be comfortable with the plain meaning construction. The concern is the defendants are attempting to read in this crystalline purity requirement and so we have responded by arguing that that would be inappropriate. So if the term is to be construed as something other than plain meaning, the plaintiffs' proposal is that it should be purity with respect to other chemical compounds, not with respect to crystalline purity, and that is consistent with the intrinsic evidence. The defendants are relying on extrinsic evidence that need not be resorted to, nor have they even defined or explained what crystalline purity is or how it could be determined.

So the intrinsic evidence is critical here in supporting the plaintiffs' proposed construction. This is a term from the '183 patent. It's not one of the terms being interpreted, but it uses the term free of any impurity, and it defines the impurity as a specific chemical compound which is known as 2 hydrozinoadenosine, or 2HA, and that is discussed also in the specification.

This is a portion of the patent specification, column 4 of the '301 patent, that describes one of the main objectives of this invention that is described in these patents. And so we're talking about methods of synthesis for regadenoson, and the specification indicates that a minor impurity was seen in the final product when a certain synthesis method was used, and that impurity again is described as a compound of a particular formula, and it's undisputed that the formula shown there is again for this 2HA, another chemical compound.

Further described in the specification is a method of synthesis, an alternative method, that allows for regadenoson to be made with this impurity removed from the final product.

So impurity is used both in other claims and in the specification to describe other chemical compounds that the inventors were desiring to avoid, because impurities can create safety issues with pharmaceutical products.

And in another aspect of the specification, there's a description of purity of 99.6 percent, which is the term we're dealing with here. It's talking about the purity of the monohydrate and the way of getting there is to remove in this instance the majority of excess methylamine, which is another chemical compound.

And also I should note, there's a reference there to HPLC analysis, and in another portion of the specification there's a reference to determining purity by HPLC, which is high performance liquid chromatography. We presented evidence in the briefing that that method allowed for the determination of purity with respect to other compounds, not with respect to amorphous forms or other forms, which is the construction that the defendants are attempting to impose.

Now, here is the claim structure of the relevant claims from the '301 patent. You see the relevant term appears in claims 8 and 13, and each of those claims depends off an independent claim that contains the phrase substantially free of 2HA, which is the impurity that we discussed previously.

So looking at the claim structure, it's clear that purity is being connected with independent claims that talk about removing that impurity. So the same is true with respect to the relevant claim in the '883 patent, claim 5,

which depends off of claim 4, which depends off of claim 3, which again refers to this impurity.

THE COURT: See, here's what my reaction to this dispute is. As a layperson, and I'm not ruling as a layperson because I'm supposed to rule from the perspective of a POSITA, but from the perspective of a layperson, I feel like the defendants are pulling a fast one, that this is a no duh kind of thing. That, of course, this is what purity means is what the plaintiffs say, and that's why Sun says there really is no need to construe the terms.

And it's one of these things I think probably my sense is that it's such an obvious thing, that's why there's no lexicography defining purity, because everybody knows what it means.

And you point, as you are, doing a good job of pointing to instances in the specification, the claims and the written description that would seem to suggest that purity is this obvious thing. But the problem is, it doesn't definitively say it. And so I'm just wondering, you know, will I be found to have erred if I don't consider some expert that comes in and says, well, no. Purity means something. It has got to do with crystal structure. It has nothing do with the monohydrate relative to the other compound or anything like that.

And so part of me wants to say, you know what?

Let's just have a hearing. We'll bring in the experts. And if I find their expert to be uncredible, they pay some cost for it, because it seems like a real stretch.

What do you think about that?

MS. WIGMORE: Now, we could do that, Your Honor. Our position is there's no ambiguity here that requires --

THE COURT: See, the problem is, my guess is you're right. That's my guess. And I think that any scientist would say that, but I'm not a scientist, you see?

MS. WIGMORE: Understood.

THE COURT: It strikes me like the equivalent is when you are a lawyer and, you know, the judge made some boneheaded ruling and you go to try to find the case to show the judge is wrong, but it's such a fundamental principle, no case says it, because everybody knows it, and you're kind of in a bind as a lawyer. I've been there. That's kind of what I feel like this is about.

MS. WIGMORE: Your Honor, our position is that if we adopted a plain and ordinary meaning construction, which Sun has proposed, which we originally proposed, but the experts are in the course of expert discovery allowed to give opinions about what they think it means, I think it could be handled that way instead of as a separate claim

construction. It's not a complicated question. So we would be comfortable with the terms being construed as plain meaning. If they want to have an expert and on the merits come in and say this is what it means, we would, of course, disagree with that, but the question is, does there need to be a separate Markman extrinsic hearing or could that just be dealt with as part of expert testimony?

THE COURT: Yes, especially since this is a bench trial.

MS. WIGMORE: Yes.

THE COURT: All right. Let me hear from the defense.

MR. BENSON: Your Honor, may I appear on behalf of Sun real quickly?

THE COURT: Sure.

MR. BENSON: So for clarity, Ms. Wigmore is correct. At the beginning, Sun's position was that this was a term that didn't require construction, that a person of ordinary skill in the art reading the language would clearly understand what that meant. And in the process of briefing, when we saw plaintiffs' brief, we have subsequently joined with the other defendants with respect to that position.

And if I could just briefly, you know, because I do think it's instructive for the Court to understand at least in part why, you know, why we feel defendants'

construction here is the correct construction, although we don't disagree that this is one of those cases where it is probably best left to expert discovery and one of those cases where the district court exercises its discretion and addresses this at expert discovery.

THE COURT: So why don't we do that. Look, I've got enough things on my plate for sure. Right? By the way, just calculate, so I decided 1,540-some motions in the past 12 months. Those are contested motions.

MR. BENSON: That's impressive.

THE COURT: Well, I think Judge Andrews probably decide more.

My point is, I don't need to decide things unless I need to decide things. So it's a bench trial. Why don't we just say plain and ordinary meaning and then the experts can argue over it.

MR. BENSON: That's certainly acceptable to Sun, Your Honor.

THE COURT: How about the other defendants?

MR. JAROS: Your Honor, we would appreciate the opportunity to consult our clients on whether it would make sense to have a hearing where you did, in fact, hear the expert testimony on the subject. As you know, our expert did do a detailed declaration.

THE COURT: But I didn't read this. Everybody

knows who appears before me. You've been before me before.

MR. JAROS: Yes, Your Honor.

THE COURT: I don't touch expert evidence unless a party explicitly says, you can't resolve this on the intrinsic evidence. You need to resort to extrinsic evidence. You know, I get a thousand pages and I read them carefully, but I don't read something I don't need to read.

MR. JAROS: Understood. We presented the evidence we presented in the briefing, the pie charts, of how a POSA would interpret it, came from the experts.

THE COURT: I know they did. I read them when they were in the brief. I didn't go back and read the declaration.

MR. JAROS: Understood. Here's our proposal, Your Honor. We think there might be a misunderstanding with respect to the distinction between crystal structure and crystalline form. Our expert did a detailed declaration on that point.

We would be happy, subject to consulting --

THE COURT: I've already construed that term, so is that what you are trying to do, reargue the first term?

MR. JAROS: I'm not trying to reargue it, Your Honor.

THE COURT: Okay.

MR. JAROS: This term is the crystalline

monohydrate with a certain purity.

THE COURT: Right. This term is the purity.

MR. JAROS: Of the crystalline monohydrate.

THE COURT: Right.

MR. JAROS: So monohydrate would be in play there.

THE COURT: Okay.

MR. JAROS: If we were to present testimony to the Court as to what 99.6 means --

THE COURT: We're going to go back into the first term is what you are saying?

MR. JAROS: I think it would give the expert an opportunity to distinguish crystal structure from crystalline monohydrate and the Court may find that persuasive or may not, but we can see some value in a hearing, because the question of the scope of monohydrate is a critical one to this case, and there's no intrinsic evidence, and there's no Court decision in 20 years of litigation where any Court has construed monohydrate to include amorphous or liquid.

THE COURT: But I didn't construe that. Did I construe it that way?

MR. JAROS: I think it's unclear whether plaintiffs' position that monohydrate includes amorphous and liquid has, in fact, been adopted.

THE COURT: So I just adopted -- I didn't import the limitations that you all said. You're not precluded from making that argument as far as I'm concerned. The closest that you might infer is I did reference the '301 patent, column 6, lines 54 through 57, and that was the last point I made in support of my ruling. But you can jettison that point, you know. In other words, I did not explicitly -- I didn't import a limitation of an amorphous form in the definition either. I did cite that those three lines, and they were cited in the plaintiffs' brief, as informing my decision, that's true. But anyway, my decision is what it is.

I'm not going to revisit claim construction on that term, and I'm going to hear from the experts, and, of course, I can always revisit claim construction if things were brought to my attention that made me think I made an error, which I do all the time. I mean, make errors. I don't revisit construction all the time.

MR. JAROS: Understood, Your Honor.

THE COURT: All right.

MR. JAROS: With that said, we have a very short set of slides on 99.6.

THE COURT: Right. But my point is, I don't think construction is necessary. I think that this can be a battle of the experts.

MR. JAROS: Understood, Your Honor.

THE COURT: And if we get to trial and you're going to present these very different views of what purity means, and let's say I'm persuaded by your expert, and I'm so persuaded that I say well, I need to rethink then should I have added some limitation to monohydrate, I could do it at that time. Right?

MR. JAROS: Yes, you could.

THE COURT: All right. Let's do that. I guess that takes care of the seventh term as well then. Does it?

MS. WIGMORE: We believe it does, Your Honor.

THE COURT: Well, maybe we should hear from the defendant then. Is there anything different about term seven?

MR. RAKOCZY: Absolutely, Your Honor.

THE COURT: Okay.

MR. RAKOCZY: That claim is very limited by virtue of the disclaimer and the prosecution history.

THE COURT: All right. So why don't I hear from the defense first.

MS. WIGMORE: Okay.

MR. RAKOCZY: Your Honor, William Rakoczy on behalf of Apotex and Dr. Reddy's, defendants.

We propose that claim 17 of the reissued '301

patent, in particular, the 99.6 percent pure regadenoson term be construed to mean 99.6 percent pure crystalline monohydrate regadenoson by virtue of the clear and unambiguous disclaimer in the reissue of the prosecution history.

I won't belabor the history of that prosecution, Your Honor. It is set forth fairly clearly in the briefs. But for context, the applicants filed an application to reissue the '601 patent, which I will refer to as the original '601 patent, and in doing that, they filed an amended claim set which included what you see here on slide 69, which is claim 14, which became claim 17. They are identical, so I may refer to them interchangeably.

Now, as part of that amendment, Your Honor, they had to show the Examiner that they were not introducing new matter by virtue of that amended claim. And this is very common, and this is the first bases or factual bases in the intrinsic record for the disclaimer.

What they did to show the Examiner no new matter was added, they have to identify the support in the original patent. Basically, they have to tie the new amended claim to some portion of the written description and/or the claims in the original patent so the Examiner knows what they are claiming and that they are not claiming anything new.

And so what they did here, as we see on slide

70, they pointed to column 15 of the original '601 patent as well as claims 1 and 4.

And let's look at those. Here on slide 71, we have the first item of support at column 15. This is the example from, excuse me, the written description that tells a skilled artisan how to make the crystalline monohydrate regadenoson. So this is the first way that the applicants tied that claim 14, now claim 17, to the crystalline monohydrate.

The second way was even more explicit, Your Honor. They cited claims 1 and 4 of the original '601 patent, which you see here on slide 72. These are all of the claims of the original '601 patent, and they are all limited to, or they all contain the crystalline monohydrate limitation.

Very briefly, claim 1 was directed to the pharmaceutical composition prepared from a crystalline monohydrate from of regadenoson, and then claims 2 through 5 all ultimately depend on claim 1.

So we know from case law and Section 112 that all of those dependent claims then also incorporate and include the crystalline monohydrate limitation, including claim 4, which is the crystalline monohydrate with a purity of at least 99.6 percent.

So by word and deed they tied that amended claim

14, now claim 17, to the crystalline monohydrate limitation, but they went even further than that, Your Honor.

In a corrected reissue declaration or oath, they then represented to the Examiner in order to obtain allowance to this claim, they said, "The error upon which reissue is based is a failure to include claims of a narrower scope, such as pending claim 14, than the claims of U.S. Patent No. 9,085,601." In other words, they represented to the Examiner that claim 14, now claim 17, is of narrower scope than the claims of the original '601 patent.

Now, these reissue oaths, Your Honor, they're not perfunctory. They're not a simple form. According to the MPEP, they're an essential part of the reissue application. They have to be personally reviewed and approved by the primary Examiner, and this is not just attorney argument. These are the actual inventors themselves swearing under oath what the scope of their claims are. And they said, claim 14 is narrower than the claims of the original '601 patent.

Let's look and see what that means. Here on slide 74 I've duplicated again the original claims of the '601 in the upper box, 1 through 5. The lower box then is that claim 14, which issued as claim 17 in the reissue patent, and it reissued because of this declaration.

And, again, there is no dispute that all claims of the original '601 patent contain the crystalline monohydrate limitation. That's 1 through 5 above.

There's also no dispute that plaintiffs' interpretation of claim 17 does not include the crystalline monohydrate limitation. Plaintiffs take the position that claim 17 is any regadenoson, not crystalline monohydrate.

For their declaration, Your Honor, to be true, that, in fact, pending claim 14 is narrower than the claims of the '601, it must be construed to contain the crystalline monohydrate limitation. If it isn't, if it isn't, plaintiffs would be allowed to do something different in litigation than what they told the Examiner in prosecution.

To get claim 17 to issue, they told the Examiner it was narrower than the claims of the '601, meaning it has to have a crystalline monohydrate limitation. Now they are saying something different.

THE COURT: All right.

MR. RAKOCZY: They are saying that it's broader.

THE COURT: There is a lot of argument on this. I didn't follow briefing, so go slow with me here on this one.

MR. RAKOCZY: Yes.

THE COURT: All right. So where is the

crystalline monohydrate limitation in the vacated claims, if you will?

MR. RAKOCZY: So the upper claims 1 through 5 are from the original '601.

THE COURT: Right.

MR. RAKOCZY: You see a pharmaceutical composition prepared from crystalline monohydrate form of the compound regadenoson. That long chemical name is regadenoson. There's no dispute about that.

THE COURT: Yes.

MR. RAKOCZY: Then each of the dependent claims of the '601, 2, 3, 4, 5, they all ultimately depend on claim 1.

THE COURT: I get it. So, in other words, the narrowest reading of 1 through 5 for this purpose is that I've got a crystalline monohydrate with a purity of 99.6 percent.

MR. RAKOCZY: Yes.

THE COURT: Okay.

MR. RAKOCZY: But they all contain crystalline monohydrate limitation.

THE COURT: Correct. I got that. Right. So then I get down to 17.

MR. RAKOCZY: Claim 17 --

THE COURT: Right.

MR. RAKOCZY: -- does not use the words crystalline monohydrate.

THE COURT: Right.

MR. RAKOCZY: Plaintiffs have taken the position that because it doesn't, it's broader than claims 1 through 6. It is not limited by the crystalline monohydrate.

THE COURT: Okay. So hold on a second. Let me now look at the --

MR. RAKOCZY: And their position is also set forth on page 75 of the joint brief.

THE COURT: Right. And I'm looking at 22. All right. Okay. That seems like a pretty good argument to me.

MR. RAKOCZY: So, and if I may, I would like to just address --

THE COURT: And this is a different issue I see now. This is why I think I didn't pay sufficient attention to this issue, because I kind of thought it was really just a duplication of the first issue, which it's not, because we're not defining in here what 99.6 purity is.

MR. RAKOCZY: We are not, Your Honor.

THE COURT: Okay.

MR. RAKOCZY: We're limiting scope.

THE COURT: Which seems to me to be a compelling argument. Let me hear from plaintiff.

MR. RAKOCZY: Your Honor, if I may, may I have some rebuttal time to address a few additional points?

THE COURT: Sure.

MR. RAKOCZY: Thank you, Your Honor.

MS. WIGMORE: Your Honor, there are some commonalities with the prior term and then there's this distinction that Mr. Rakoczy just discussed, but in terms of the parties' proposed constructions, it did import that purity with respect to other chemical compounds or the crystalline purity issue that we talked about for the prior claim.

I think we've agreed that --

THE COURT: Right.

MS. WIGMORE: That will not --

THE COURT: The point is they're not importing that, right, when I look at this.

MS. WIGMORE: I understand. I wanted to make clear our proposed construction with other chemical compounds, we understand now that would be a plain meaning construction of purity.

I will now address Mr. Rakoczy's arguments about trying to import the crystalline monohydrate --

THE COURT: I think he has got a pretty compelling argument.

MS. WIGMORE: And I think the key here is

whether there's a clear and unmistakable disclaimer, and to determine that we need to look at the specific statements that were made in the course of the prosecution.

THE COURT: Right.

MS. WIGMORE: And the standard, as I'm sure your Honor knows, is a high one. It has to be clear and unmistakable, and if the statement is ambiguous or even amenable to multiple interpretation, there is no prosecution disclaimer.

THE COURT: Right.

MS. WIGMORE: The reissue statute is relevant here because it sets forth when a party can pursue a reissue.

The chronology here is there was an initial patent, the '601 patent that contained five claims. The applicant then put the patent into reissue importantly within two years of its issuance and obtained additional claims 6 through 17.

So the original five claims remain in the reissued patent and then there are additional claims 6 through 17 that now make up the '301 patent. But the key point from a timing standpoint --

THE COURT: So actually, hold on. We're dealing with the '301?

MS. WIGMORE: '301 patent, Your Honor. If it

would be helpful, we can pull up the claims.

THE COURT: Hold on a second. You just said they were -- how many claims did you say there were?

MS. WIGMORE: There's a total of 17 claims in the '301 patent, which is the reissued patent. The first five of those claims came from the original patent, and then in the reissued --

THE COURT: Yes. Just hold on a second.

MS. WIGMORE: Sure. If Your Honor has the '301 patent?

THE COURT: No, I do. The patent was -- I had the wrong tab on it.

MS. WIGMORE: All right.

THE COURT: I'm looking at the number of claims. All right. But actually, I think I got some bad information from none of the parties in preparing for this. So just basic patent stuff, which I don't have the benefit of.

So right now there are valid, or all 17 claims. Correct?

MS. WIGMORE: That's correct. And if you look at those claims --

THE COURT: And if it were not valid, it would have a line through it?

MS. WIGMORE: That's right.

THE COURT: That's all I want to make clear.

All right.  So I'm good.  Keep going.

MS. WIGMORE:  Sorry.  Claims 1 through 5 were canceled, but they were the ones -- sorry.  I misspoke, Your Honor.  The first five are in brackets in the patent.  They were the original claims.

THE COURT:  So wait a second.  So they have been canceled?

MS. WIGMORE:  That's correct.

THE COURT:  That's what threw me for a loop. That's why I said, wait a second.  I'm missing something really fundamental here.

MS. WIGMORE:  I apologize.

THE COURT:  Okay.

MS. WIGMORE:  They're in the patent in brackets.

THE COURT:  But they are gone.

MS. WIGMORE:  But the structure of the claims becomes relevant.

THE COURT:  It might be, but like I said, I basically had a law clerk in preparation for to find out what is bracketed.  She told me that these are gone.  Now you are telling me they are not?

MS. WIGMORE:  They appear in the patent, but they are canceled, and 6 through 17, which are in italics, are the operative claims that came out of the reissue.

THE COURT:  All right.

MS. WIGMORE: But I want to turn to the language of the original claims, because I think the way they've been described is not quite accurate. And if we turn to -- I'm on slide 49. We're using claim 1 of the original patent as an example. It says, a pharmaceutical composition prepared from a crystalline monohydrate, and all of the claims of that original patent had that requirement, prepared from. Now, that is different from a pharmaceutical composition containing a crystalline monohydrate. All it requires is it be prepared from one.

So to the extent defendants are arguing that we were always limited or we're now limited to something that contained a crystalline monohydrate, that is never what the original claim says.

So in terms of the reissue, the reissue was brought within the two years, which meant it was appropriate and possible for the applicant to enlarge the scope of the claims. There was no statutory bar.

THE COURT: Just stop for a second. Okay. I'm sorry. Go ahead.

MS. WIGMORE: So the applicant was entitled to enlarge the scope of the claims and that is what the patent does.

So we'll walk through each statement that was made, but the key point is when the reissue was pursued, the

applicant was very clear that it wanted to broaden the claims to eliminate that prepared from crystalline monohydrate requirement, which was a product-by-process limitation. That was very clear all along. The Examiner acknowledged that, but then the Examiner in the course of prosecution raised questions about a separate part of the claim language toward the end, the language, by addressing at least one pharmaceutically acceptable carrier.

The Examiner pointed out that the reissued claim 17, which was called 14 then but it is 17 now, uses the phrase dissolved in a pharmaceutically acceptable carrier. So the Examiner pointed out that in that respect, the reissued claim was narrower, not broader, which is true with respect to that limitation. But by agreeing with that, by at least accepting the Examiner's request to file a declaration about that, the applicant made no reference whatsoever to the fact that they wanted to eliminate this prepared from crystalline monohydrate.

I want to talk about the statement specifically because I think the context is very important.

Now, in terms of the original reissued declaration again brought within that broadening period of two years, the applicant made very clear, and this is Appendix KK, by reciting a specific method of preparation that is prepared from the crystalline monohydrate, the

patentee claimed less than he had the right to claim in the patent. So that was the purpose of the reissue, and it was appropriate to do that within two years.

And you'll see in the reissued claims that that language is removed. It doesn't say, prepared from a crystalline monohydrate. It just says, a pharmaceutical composition comprising 99.6 percent pure regadenoson.

Now, the statements that the defendants are relying on do not form the basis for a disavowal, and here is why.

First of all, they come from the Examiner, and the Examiner made clear, and this is Appendix MM, that with respect to the phrase, adding at least one pharmaceutically acceptable carrier, which was from the original claims, the Examiner wasn't clear how the new claim could be broader in that respect because it says, dissolved in. An Examiner was saying that dissolved in is narrower than adding.

There was an interview, and that interview is summarized in Appendix NN. And in that interview, the Examiner agreed that claim 1, the original claim, was a product-by-process claim that is prepared from crystalline monohydrate, and pointed out that claim 1 does not define the final form of the compound in the carrier, meaning, as I mentioned to Your Honor earlier, the final composition does not need to contain crystalline monohydrate. It was

prepared from, and the Examiner acknowledging here that that is something that the applicant was addressing with the reissue. But in the same appendix, the Examiner noted that claim 1 was broader, and -- but that claim 1 was broader than the independent claims in the sense that claim 14, which is now the claim 17 we're talking about, limits the compound to a specific purity as well as requiring that the compound is dissolved in a carrier.

So all of the Examiner's statements and concerns are focused on this pharmaceutically acceptable carrier portion of the claim and whether the new claim was narrower than the old claim because it was dissolved in rather than added to.

Now, the applicant responded in Appendix G by saying the applicant respectfully disagrees with the Examiner's characterization of the claims, but in order to advance prosecution, they submitted a new declaration.

And at the bottom of slide 52 is that declaration, Appendix OO, where it says, the error is failure to include claims of narrower scope. So from the context of all of this, it's quite clear that the Examiner was concerned about narrowness of the pharmaceutically acceptable carrier language. The applicant did not adopt the Examiner's concerns about that, but did file this declaration mentioning narrower scope.

Now, for a disclaimer, you have to have a very specific, clear and unmistakable disavowal, and anything ambiguous or amenable to multiple reasonable interpretations cannot be a disavowal.

Here, it's very clear from the context that the statements about narrowing that the Examiner was making and that the applicant reserved its objections to had nothing to do with this product-by-process limitation prepared from a crystalline monohydrate. That was always the main reason for the reissue. That never came up. The Examiner never disagreed with it. The only dialogue back and forth about narrowness had to do with a separate, dissolved in a pharmaceutically acceptable carrier language.

So there is no basis for finding a prosecution disclaimer based on what at best is ambiguous, but if one looks at the documents as we've just walked through, are quite clear what was going on.

Just for the Court's reference, we have a timeline of those statements on slide 53, but it's all the statements that we have just walked through.

So if you turn back to the claims at issue, the original claim 1, the prepared from a crystalline monohydrate does not appear in the reissued claim, claim 17. There is no dispute about that. That was the purpose of the reissue. That was appropriate because it was within the

two-year period.

The language about pharmaceutically acceptable carrier is narrower in the sense that it is dissolved in instead of adding, and that was what the Examiner raised concern about, and that was what the applicant addressed in the new declaration.

Now, the case law that the defendants have cited doesn't apply here. They've argued in their surreply that if a statement -- if a claim is broader in any respect, then it's broader, it can't be narrower, but that doesn't apply in the context of this prosecution disclaimer.

They cite to In re Bennett, which is a case involving a broadening reissue. Under the statute, as I mentioned, you can only broaden your claims if you file within two years. In re Bennett addressed whether you file that reissue within two years, but there's some error in your declaration, have you met that two-year requirement even if you have to fix your declaration. And the Court, the Federal Circuit concluded that you could, but the statement about if a claim is broader in any way and narrow in other ways, it's still broader, that applies in the statutory bar context, not in the context of a disclaimer here, where the claim could be broader in some respects. It could be narrow in others, but we weren't precluded in any way from broadening the claim because we filed within the

appropriate time period.

They also cite a Medtronic case, which has to do with validity, and we are not at this time, Your Honor, addressing the question of patent validity. But the defendants have relied on case that involves what's called a recapture rule, where you've given something up in prosecution, you can't get it back. That is not the situation in which we find ourselves. This is not a case where the claims before reissue were narrowed in such a way that we couldn't broaden them in this respect. The Examiner never mentioned that. We certainly had the support in the specification for a broader claim that did not have this process limitation.

Moreover, the reissue, the recapture rule makes clear and the Medtronic case makes clear although the first question you ask yourself when you are applying that test is whether the claim is broader in any respect.

The third part of the test ultimately looked at whether the claims have been narrowed in other material ways. And here, of course, they have, because the Examiner noted that the pharmaceutically acceptable carrier language is narrowed and the purity limitation is narrower.

So the bottom line, Your Honor, there are statements during the reissue about narrowing, but when one looks at the context, they were directed specifically

towards this carrier issue. The Examiner understood and the applicant was very clear all along that this reissue was to remove that product-by-process prepared from a crystalline monohydrate requirement, and we ended up with a claim that is simply a pharmaceutical composition comprising 99.6 percent pure regadenoson. No reference to crystalline, no reference to monohydrate, but those are terms that the defendants are now tying to read in based on statements in prosecution that were made for other reasons and that cannot unambiguously be attributed to removing this process limitation.

THE COURT: Okay. Well, I said you made a compelling argument, but your friend across the aisle made a very compelling argument.

So can you show me where there's a clear and unmistakable --

MR. RAKOCZY: Yes Your Honor.

THE COURT: -- acknowledgment that the claim was being narrowed with respect to this crystalline monohydrate?

MR. RAKOCZY: Absolutely, Your Honor. And what I heard I think was an attempt to rewrite this language and this oath. But I will go back, Your Honor.

First, again, in the support for the new claims, which they had to provide to the Examiner, and let me back

up a second, Your Honor. We are not basing our disclaimer argument on the Examiner's understanding or what he said. That is incorrect to the extent they suggest that.

THE COURT: You're basing it on the evidence and affidavit?

MR. RAKOCZY: The applicant.

THE COURT: The applicant's statement that it's a narrower scope.

MR. RAKOCZY: Yes. Well, two things. First, the applicant is trying the claim to crystalline monohydrate and a written description.

THE COURT: Hold up. So the two things are, one, the applicant is tying what?

MR. RAKOCZY: They tie claim 14 to the crystalline monohydrate in both the written description of the '601 patent as well as the claims of the '601 patent.

THE COURT: All right. And the second thing is?

MR. RAKOCZY: That's the support.

The second thing is the reissued oath where they said claim 14 is of narrower scope than the claims of the '601 patent.

THE COURT: Right. But I mean, look, I'm already going to rule that the narrower scope, I'm persuaded that that could reasonably be interpreted as applying to the

dissolving language as opposed to the adding language, and so that's a reasonable interpretation. So that alone doesn't get, doesn't make it clear and unmistakable for you. That I'm already going to rule. I can tell from reading enough of the prosecution history, I'm comfortable with that. All right. Go ahead.

MR. RAKOCZY: Your Honor, it doesn't say that. That's the problem.

THE COURT: But the law says, right. I mean, the law says if there is -- it has to be clear and unmistakable, and if there's a counterinterpretation that would account for that language in the affidavit, narrowing scope, then it's not clear and unmistakable.

MR. RAKOCZY: Actually, Your Honor, the clear and unmistakable is just one part of the law. The other part of the law is what the Federal Circuit does to determine whether a reissued claim is broader or narrower than an original claim, and that standard we've articulated here from the Bennett case on slide 78, but it goes all the way back to the predecessor court in the Federal Circuit, prior to 1958.

So over 60 years, when the Federal Circuit wants to know, is a reissued claim narrower or broader, they determine --

THE COURT: Just so I understand it, you're

allowed to broaden the claim on reissuance if you seek to do so within the time limit indication. Is that correct?

MR. RAKOCZY: Yes, but that's not what they did, Your Honor. They told the Examiner they were doing reissue because claim 14 was of a narrower scope.

THE COURT: Well, I mean, they did that in response to what the Examiner did. I mean, they had the ability to expand the scope. Correct?

MR. RAKOCZY: They had the ability to, but that's not what they wanted to do. They told the Examiner they wanted a narrower claim.

THE COURT: So I get that when it comes to disclaimer, what they want is relevant. But you're asking me now to apply, and you're citing this Bennett case, the standard that applies, as I understand it, when the Court is trying to determine whether or not there was a broadening of the scope.

MR. RAKOCZY: Yes.

THE COURT: All right.

MR. RAKOCZY: And they apply that across the board, Your Honor, to reissue claims. So it doesn't matter if it's narrowed in one respect. What matters is: Has it been broadened at all? And there's no question here --

THE COURT: But isn't that a different -- it's a different test. Right? I mean, that's not what we're

applying here.

MR. RAKOCZY:  It is what we're applying here, Your Honor.

THE COURT:  Why?

MR. RAKOCZY:  We're applying a disclaimer based on the fact that they told the Examiner that claim 14 was narrower than the claims of the '601 patent.  Because of that oath that the inventor signed, they allowed the patent, they allowed it to grant.

Now --

THE COURT:  I'm not going with whether they allowed the grant.  As I understand it, the relevance of the disclaimer goes to construction.  It's that you can't, as a patentee, tell the Patent Examiner one thing and then seek a broader claim here, and I get that.  That's just regular disclaimer.  I don't get how Bennett comes into the picture.

MR. RAKOCZY:  Because Bennett tells you how you know whether plaintiffs' construction is broader or narrower today.

Plaintiffs say that claim 17 today is not limited to crystalline monohydrate, it is any regadenoson. You just heard that at the end of plaintiffs' argument.

During prosecution, they said the opposite, Your Honor.  They said, claim 17 was narrower than the claims of the original '601 patent.

THE COURT: Right.

MR. RAKOCZY: We know that's not true. It can't be.

THE COURT: Okay.

MR. RAKOCZY: Because all claims of the '601, and this is not disputed in the record, had the crystalline monohydrate limitation.

Now they are trying to jettison that limitation from claim 17, so they are doing exactly what Your Honor just said. They said claim 17 was narrower to get it issued, and now in this court they are saying it's actually broader. That's exactly what disclaimer was designed to prevent.

THE COURT: What I see them referring to in that disclaimer is not the crystalline monohydrate limitation. They seem to be specifically recognizing that it's narrow with respect to the dissolving.

MR. RAKOCZY: Respectfully, Your Honor, they did point to the crystalline monohydrate.

THE COURT: Okay. So show me that.

MR. RAKOCZY: Right here, when they told the Examiner, where is -- the Examiner asks: Where is your support for the new claim 14 or 17? Where are you getting that or is that a completely new animal? They point to claims 1 and 4 of the original '601 patent. Claims 1 and 4

of the '601 patent here --

THE COURT: Step back. Start over again here, what you think.

MR. RAKOCZY: When they told the Examiner claim 14 is supported by the original '601 patent, it is tied to that patent in two ways.

First they pointed to column 15 and then they pointed to claims 1 and 4. Column 15 is the example on how to make crystalline monohydrate regadenoson. Even more clearly, Your Honor, claims 1 and 4 that they said support their claim 14 in amended form are the claims to the crystalline monohydrate.

THE COURT: Yes, but you're ignoring the language, a pharmaceutical composition prepared from, and you're ignoring the language by adding at least one pharmaceutically acceptable carrier.

MR. RAKOCZY: Your Honor, that wouldn't make -- that would not make the new claim 17 narrower because it's still broader.

If claim 17 --

THE COURT: What's still broader? You said it.

MR. RAKOCZY: Claim 17, the new claim.

THE COURT: Yes?

MR. RAKOCZY: Is broader than these original claims because it doesn't have, according to plaintiffs, the

crystalline monohydrate limitation.  So even --

THE COURT:  Well, no, because it's a pharmaceutical, because the original claim was referring to the preparation of the pharmaceutical composition.

MR. RAKOCZY:  Your Honor --

THE COURT:  And it's referring to adding at least one pharmaceutically acceptable carrier.

MR. RAKOCZY:  But just because the claim might be narrower in one respect doesn't mean that it isn't broader.

THE COURT:  You rise and fall with Bennett.

MR. RAKOCZY:  No, we don't rise and fall with Bennett, although Bennett is binding Federal Circuit law.

THE COURT:  Where I'm confused -- I mean, I thought it's talking about something different.  I didn't think Bennett was talking about a disclaimer.

MR. RAKOCZY:  No.  It's determining the standard for, how do we know whether a reissued claim is broader or narrower than its original claims.

THE COURT:  Right.

MR. RAKOCZY:  And here, applied here we know, it's undisputed, the '601 patent contained the crystalline monohydrate limitation in every single claim.  That's undisputed.  We know that claim 17 as interpreted by plaintiffs does not have that limitation.

So as interpreted by plaintiffs, claim 17, whether it's narrow in other respects or not is irrelevant. If it doesn't have the crystalline monohydrate limitation, it is broader at least in one respect in the original claims, and that, Your Honor, is exactly contrary to what they said in their oath.

This oath, if I might add, it doesn't say narrower in some respects, or narrower in one way or not another way. It says narrower in scope than the '601 claims. And if I might add to that, Your Honor oftentimes you see disclaimers arising by implication, by arguments patent attorneys are making to distinguish art or things of that nature.

There's nothing to imply here. You have the inventors themselves characterizing the scope of their claims with words like narrower. I don't think you could find any more disclaimer-like language than this. It is not qualified in any fashion. It says narrower scope than the claims of the '601, and the only way that can be true is if the crystalline monohydrate limitation is also interpreted to be included in claim 17. Otherwise, it is indisputably broader.

And I want to add a point, Your Honor, on this reissue oath. Plaintiffs are acting as if this again is some kind of perfunctory declaration that they only filed

because the Examiner told them to.  This is the essential part of a reissue application.  This is what tells the Examiner what the inventors think is wrong with the scope of their claims.

So in our view, the only way to give life and meaning to this disclaimer, Your Honor, is to apply it just like it says.  Claim 14 or 17 has to be a narrower scope to the '601, and the only way for that to be true is if it includes the crystalline monohydrate limitation, because if you go with plaintiffs' construction, it can be any type of regadenoson, then it is clearly broader, and it is directly contrary to what they told the Patent Office to get this reissued patent to grant.

And, Your Honor, I think said it best on the whole purpose of the disclaimer, which is, you're not supposed to interpret the claims one way to get them issued and another way in court later against infringers, and that's what's happening here with plaintiffs' construction. They said it was narrower to get it issued and the Examiner allowed it.  Now they are saying it's broader and it doesn't have the crystalline monohydrate limitation.

One other point, Your Honor, which was mentioned in the papers.  I didn't hear it today, so I'm assuming it has been dropped.  Plaintiffs accused the defendants of somehow seeking an unprecedented extension of disclaimer law

using reissued prosecution statements and a reissued oath.

Your Honor, the law is clear from the Federal Circuit. All statements and representations in a reissue proceeding count and it can give rise to disclaimer. That has been well settled law for a very long time in the Federal Circuit and there is no law that says somehow reissue oaths are somehow exempt.

I would submit, Your Honor, reissue oaths may be one of the most imperative pieces of intrinsic pieces to use for disclaimer because, again, it's not mere attorney argument. It's the inventors themselves saying, this is the scope of our claims. And here they said, claim 17 is narrower scope than the '601. And, again, that cannot be true. It cannot be true unless it also includes the claim -- the crystalline monohydrate limitation.

THE COURT: All right.

MR. RAKOCZY: Thank you, Your Honor.

MS. WIGMORE: May I briefly respond?

MR. BARRY: Excuse me. George Barry for the Court. I'm not sure I can say anything better than Mr. Rakoczy did. I just wanted to say something slightly different on the Court's behalf.

We actually take the same position. I think the way I would phrase it is if the claim is broader in any respect, it's broader, not narrower, and I think that's what

the case law stands for.  Thank you.

THE COURT:  And I don't think the plaintiffs dispute that, that the case law says that, as I understand it, when establishing whether there has been a reissuance that satisfies the statute, but isn't that a different question than is before me?

MR. BARRY:  I don't think so, Your Honor, because they describe it as narrower, and that's Mr. Rakoczy's point.

THE COURT:  That's the point.  Then we get into, well, what did they mean by narrower?

MR. BARRY:  I don't see how you could see it as anything else other than narrower, which is the opposite of broader, which it would be broader if broader in any respect, and it's broader in the sense that it is not limited to the monohydrate, or not limited to process of being prepared from the monohydrate.

THE COURT:  Okay.

MR. BARRY:  Thank you, Your Honor.

THE COURT:  Thank you.

MR. BENSON:  Your Honor, if I may address this separately?

THE COURT:  Yes.

MR. BENSON:  I certainly can appreciate the Court's struggle with the fact that the claim is narrower in

some respects and broader in other respects, but I think what -- you know, I don't want -- I want to be sure that we're not missing the forest for the trees, and the reason why, and, you know, I agree wholeheartedly with everything that Mr. Rakoczy said, but the importance of the applicant pointing to the specification and pointing to claim 1 and 4 is that that is the support for each and every element of the claims.

And the reason why it's important to inform the Court, to inform the Examiner whether you are broadening a claim or whether you are narrowing a claim is because when you come -- you have a patent that has already been examined, and an Examiner has made a determination that the patentee was entitled to a claim that included in this case a crystalline monohydrate form. Right. You know, dissolved in the carrier, or added to a carrier.

So what the Examiner in reissue has to determine is, is there support in that patent for a broader element of this claim? Whether there are broad elements and narrow elements at some point is irrelevant to that question. Right.

So the Examiner has to look at the specification and has to look at the claim and say, okay. Is there support to -- you know, to the applicant, is there support in your patent, either in the specification or the

previously issued claims for regadenoson that is not limited to a crystalline form in regadenoson, and the answer to that is no. And the reason the answer is no is because what applicants did is they pointed to the specification where it specifically outlines manufacture of a crystalline form of the monohydrate regadenoson, and, secondly, to claims 1 and 4 that were limited to the crystalline form of the monohydrate.

There is no evidence, and I invite plaintiffs to identify any evidence in the prosecution history, whether with the originally issued patent or with the reissued patent where the Examiner ever looked to the question of does your patent support a claim directed to just regadenoson, which was, without dispute was in the prior art. In fact, it was so much in the prior art that there were clinical trials ongoing with regadenoson dissolved in water, which is essentially what these claims are here.

So did the Examiner ever look and say, are you entitled to a claim that is essentially directed to the prior art? Are you entitled to a claim that is limited to just regadenoson, not in any form, dissolved in water? Nowhere in the prosecution history of the original patent or the reissued patent is that mentioned, and that is why the fact that this is a -- that it is broader in that respect is of critical importance, and that is why the pointing to the

specification in claim 1 and 4 is the critically important element here.

THE COURT: All right.

MR. BENSON: Thank you, Your Honor.

MS. WIGMORE: Just very briefly, Your Honor.

Starting first with the point that Mr. Benson was just raising. The portion of the reference to the written description support that was shown on their slide had nothing to do with these statements about narrowing. It was another part of the prosecution where there were just statements about where the claims could find support. We certainly don't disagree that they're not supported, but that is a question for another day. That's a validity question.

There is nothing in those statements that simply identifies portions of the specification that support the claims that constitutes a clear and unmistakable disavowal of claim scope. The issue of whether a crystalline monohydrate limitation or its removal was supported or appropriate never came up during this reissue prosecution except for, and if I could turn -- if I could turn to it shown here on slide 53.

The very first declaration that was made by the applicant made clear that by reciting a specific method of preparation, the patentee claimed less than he had a right

to claim, that very explicitly drew to the Examiner's attention the process claim that the applicant wanted to remove. And we see here on May 29th of 2018, the Examiner acknowledged that. That is as far as it went in terms of discussion of the removing the prepared from limitation. There was never a debate about that. There was never a debate about whether doing so was supported. The only dialogue about narrowing related, as we see on the bottom of this slide, to this pharmaceutically acceptable carrier statement.

With respect to the case law, we don't disagree that one could disclaim and reissue or in any other proceeding, IPR, post-grant proceeding, with an unmistakable disavowal, but that's not what happened here.

And the case law that's being cited by the defendants as I've explained and as Your Honor recognized is in a completely different context. It is in the context of when an applicant is statutorily barred from seeking broader claims. In that context, any broadening, even if the claim is narrower in other respects, is not okay. In this context we were perfectly entitled to do that and we made clear to the Examiner we wanted to do that.

THE COURT: Wanted to do what?

MS. WIGMORE: We wanted to broaden the claim by removing the process limitation, the prepared from

limitation, and that never changed and that never came up. What did come up was whether other parts of the claim were narrower, and they are, and that's okay, because we're within the two years. So the Bennett case doesn't apply.

THE COURT: All right. Thank you.

All right. I'm going to think about that one. Let's go to the next term. And my inclination is to break for lunch and we'll come back. I might have more questions on the term we just finished discussing, so let's try to wrap it up.

MS. WIGMORE: The next term, Your Honor, is as shown in Figure 3. The discussion begins at page 96. The claim term appears in claim 10 and 15 of the '301 patent, in claim 2 of the '183 patent. Here's an example, the claim on slide 57. The pharmaceutical composition of claim 6, wherein the crystalline monohydrate has an X-ray diffraction pattern as shown in Figure 3.

Shown here on slide 58 is Figure 3 of the specification and a description of that figure, which displays it as an X-ray diffraction pattern for regadenoson monohydrate. And just by way of background, XRPD or X-ray powder diffraction, is a way of testing a sample and determining by the way the angles are diffracted whether there are peaks that can be associated with specific crystalline forms.

So the dispute here is whether, as defendants request, there should be a specific margin of error read into the interpretation of the phrase as shown in Figure 3. Plaintiffs' position is there need not be, and the particular limitations that the defendants are trying to read in are not found anywhere in the claims or the specification.

Now, it's clear from the case law, and the parties don't dispute that when interpreting XRPD patterns, there is some experimental error. There's never going to be an exact match, and I don't understand the defendants to be arguing that there must be. Instead, they're attempting to read in a specific limitation on the experimental error that is not grounded in the spec or the claims.

In fact, the intrinsic evidence is inconsistent with their effort to do so. Shown on slide 52 are claims from the '301 patent, claims 9 and 14. And here, there's a reference to these XRPD peaks, and they are described in about terms and they are given in whole and half integers. The defendants are trying to say they have to be within .2 degrees, but even the claims that refer to specific peaks in this diagram go much more general in terms of whole and half integers. So reading in additional precision is inconsistent with the intrinsic evidence.

THE COURT: So this strikes me again, it's just

a battle of experts. You even want to interpret it as a POSA --

MS. WIGMORE: We would be fine with plain meaning, Your Honor. We do think experts know what XRPD is. They know how to do it. They know how to how to compare results, and we would be perfectly comfortable with a plain meaning of the construction.

THE COURT: Let's hear from defendants.

MR. JAROS: I'm not sure if plaintiffs are distinguishing between plain meaning and ordinary and customary, but if the Court finds this term should have its ordinary and customary meaning, I don't believe there would be any further dispute.

THE COURT: I have to confess, this is an example of lack of experience I guess I still have after a year-and-a-half. You just distinguished between plain meaning and ordinary and customary meaning. I've heard of plain and ordinary meaning. What is the difference between plain meaning and ordinary and customary meaning?

MR. JAROS: One way to distinguish that in the Federal Circuit case law, Your Honor, is plain meaning is could a layperson read this language --

THE COURT: I never had a layperson. I thought everything was POSITA.

MR. JAROS: Some words are susceptible to

layman's interpretation and there's a section in Phillips that says if it's not super technical, a judge could interpret it consistent with plain meaning.

THE COURT: Okay.

MR. JAROS: And the distinction we're making here is counsel just referred to plain meaning, but we were talking about, as shown in Figure 3, and she directed you to different claims that did not have that language and said, see, these are integers, and therefore you can look at these integers and interpret this different language.

Our position is very simple. That language should be given its ordinary and customary meaning. There's an industry standard to do that. If Your Honor is suggesting that subject could be the subject matter of expert testimony to establish that --

THE COURT: Sure. That's exactly what I'm suggesting and figuring, you know, the expert is going to have two charts up there. One is going to be Figure 2 and one is going to be test results, and the experts are going to, probably because they're getting paid, have different opinions about what they mean, and then they are going to have to justify why one concluded they are the same and one concluded there's a difference, and I would imagine they reference periodicals and standards in the industry and standard margins of error, and then you will cross-examine

them and I would make a factual determination.

I just don't see how it benefits the fact-finder, in this case it's me, but even if there were a jury to add meaning or to try to further expound on what as shown in means.

MR. JAROS:  Yes, Your Honor.  So one quick point, and I agree with everything you have said.

With respect to all the terms we discussed today in this light, monohydrate, this particular term and the purity term, it would be helpful for the purpose of opening expert reports if these claims were more defined than they are given the parties' disputes.

THE COURT:  See, that's what I don't understand.  I guess I don't understand how they would be.  It would just shape your expert's testimony to meet whatever definition I put on there.  That's why I go back to stoichiometric, and it's funny.  I'm going to make sure I go back in the transcript because I think you defined it.  Do you remember what you defined it as?  I think it was like a ratio.

MR. JAROS:  Yes.  It is a one-to-one ratio of --

THE COURT:  No, no.  I think you defined generally what stoichiometric meant.  Do you remember how you defined it, by any chance?

MR. JAROS:  I don't recall.

THE COURT:  I think you used the word ratio to

define it.

MR. JAROS: I did. That's part of the definition.

THE COURT: That is what I think it is. My layperson understanding is how to discuss compound in terms of their ratios to different elements. Maybe that's too simplistic, but I find it just hard to believe that two experts, if they were having a cup of coffee and they referred to monohydrate, are going to have a -- they couldn't communicate. They would not have to have further definition.

Now, maybe a particular context or maybe their particular weighting for results in order to determine whether something is a monohydrate that they might differ on, but that's what expert testimony will be at trial, I thought. But I'm not convinced at all that it would be helpful -- I think it's the opposite, that it's just not necessary and the experts will battle it out.

MR. JAROS: In that case, Your Honor, we propose that the Court need not find whether this particular term has a plain meaning, ordinary and customary. We're simply deferring that to the expert report. That's acceptable to Apotex.

THE COURT: I guess what I was going to say, it's going to be given the plain and ordinary meaning, and

if you all dispute what that means, it will come out, but my sense is you are not going to dispute the plain and ordinary meaning. You're going to dispute whether or not the test result is the same as shown in Figure 2.

MR. JAROS: That's correct. I think plain and ordinary is used interchangeably with ordinary and customary in the Federal Circuit case law. So that's acceptable to Apotex.

THE COURT: That's fine. I don't think I've ever had a case yet where I had plain meaning. I always had plain and ordinary meaning. I don't think I need to construe that. I think that I would just give the plain and ordinary meaning to this term as well. All right?

MR. JAROS: Okay.

THE COURT: Actually, wait. There was a second one. Yes.

MS. WIGMORE: Your Honor, my understanding is that the defendants just yesterday indicated they could agree with our construction of as shown in Figure 2, but I think it should be treated in the same manner.

THE COURT: Wait. You are saying they agreed, we didn't have to go through the argument we just did?

MS. WIGMORE: That was my understanding.

MR. JAROS: Can I clarify?

MS. WIGMORE: Yes.

MR. JAROS: Your Honor, I'm sorry. We were mixing two very similar terms. The Figure 3 you just discussed --

THE COURT: Hold on.

MS. WIGMORE: I was referring to Figure 2. I was moving onto the next term, as shown in Figure 2.

THE COURT: I'm sorry. We were dealing with as shown in Figure 3. We've all agreed that's going to be a battle for the experts. I'm going to give it the plain and ordinary meaning. It doesn't need construction.

MR. JAROS: Yes, Your Honor. And to get us all to lunch a little bit quicker, for the last three terms, Figure 2, agonist and pharmaceutical composition, we have agreed with plaintiffs' construction and see no need for argument.

THE COURT: That's fine. That's great. The only thing we have left is for me to think about this disclaimer issue. So what we're going to do, we're going to break for lunch and come back because I might have additional questions.

You probably didn't bring lunch because you weren't expecting this. Do you want to come back in an hour?

MR. JAROS: That's certainly fine with us, Your Honor.

THE COURT: Is that all right with everybody? We'll see you at 1:15. Thank you.

(Luncheon recess taken.)

- - -

Afternoon Session, 1:18 p.m.

THE COURT: Please be seated.

All right. So I reread the briefs and am much better informed as a result of the arguments, which were really helpful, and I've read all the primary documents that were referenced in the briefs.

It's a very interesting issue and I just -- for the record, obviously, I'm referring here to now the disputed term which is in claim 17 of the '301 patent. I'm not going to be able to read the chemical formula, but it begins with the statement, 99.6 percent pure.

Can I agree we're referring to 99.6 percent pure regadenoson?

MS. WIGMORE: Yes.

THE COURT: We can agree to that? Okay.

Now, what's interesting is that the initial application for reissuance sought to broaden the claim and expressly stated that in the remarks section of the amendment, which is found at Appendix E. And as plaintiff noted in their argument, and I think this is all undisputed, that the remarks noted that the original claim 1 in the

patent is directed to a pharmaceutical composition prepared from a crystalline monohydrate form of the compound, regadenoson, and then the key phrase was, "by reciting specific method of preparation, the patentee claimed less than he had a right to claim in the patent."

Now, the date of that application was July 19th, 2017, so then followed barely a month later a second amendment filed with the PTO. And in the remarks section to this, I guess I will call it the inventor, but I guess it's the counsel for the inventor, stated that a first preliminary amendment was filed concurrently with this application on July 19th, 2017, which is what I just read from and then, "the second preliminary amendment supersedes the first preliminary amendment."

And then the remarks are silent as to whether there's a broadening or a narrowing of claims being sought. But attached to this second amendment is the status of claims in support for changes, spreadsheet, or a table that was referenced in both sides' slides, and it is unmistakable that support cited for claim 14, which became claim 17, the claim that's at issue, explicitly references claim 1 and claim 4 of the '601 patent. And I think it's undisputed that claim 1 and claim 4 read together require a crystalline monohydrate.

So then we go to May 2018 and now we hear from

the Patent Examiner. And so far nobody disagrees with my recitation of the history? Plaintiff?

MS. WIGMORE: No, we do not.

THE COURT: Defendant?

MR. RAKOCZY: We do not, Your Honor.

THE COURT: So then in Exhibit MM, which is a document issued by the Patent Examiner, the Examiner says, it's unclear how the newly presented claims were broader than the original claims. So I guess that the Patent Examiner still has in mind the preliminary application, not the superseded second, or the superseding second amendment, which didn't mention broadening.

And then on May 29th we have the interview with the Patent Examiner, and the report of that interview is set forth in an office communication that is in the joint appendix at NN. And according to the notes, the Examiner stated that claim 1 was broader. There's no reference to claim 4. And at the end it's noted, and I quote, "It was suggested that a declaration stating that the error was failure to include claims of a narrower scope would overcome the rejection based on a defective declaration."

Now, plaintiffs want to say that, well, the inventor didn't agree with the Examiner, and actually there is record evidence that essentially the Examiner, you could argue, or the inventor maybe preserved any objections to the

Examiner's statement, but at the end of the day, the inventor made a sworn declaration, and in that declaration, and I just want to make sure. Is it the inventor who swore the declaration or is it plural?

MR. RAKOCZY: All the inventors.

THE COURT: Yes. I noticed there were attachments to it. So it's all the inventors. All right?

MR. RAKOCZY: Correct, Your Honor.

THE COURT: And they swore under oath, "The error upon which reissue was based is a failure to include claims of a narrower scope, such as pending claim 14, then the claims of U.S. Patent No. 601."

A couple of things that I find informative. The statement was made under oath. Second, the statement explicitly refers to pending claim 14, which is the disputed claim 17 before me. Third, the last clause of the sworn statement refers to claims, plural. And so I think when you read that with the support of changes table, it can only be read as referring to, or it can only be read as including claims 1 and 4. In other words, I think it's clear and unmistakable that it's referring to claims 1 and 4, and then it is referring to a narrower scope that the inventors are now swearing under oath that claim 17 had.

So that to me is the statement by itself, notwithstanding the maybe circuitous or tortured history it

took us to get there, but the statement under oath is clear and unmistakable.  It's a disclaimer.

Now, the plaintiffs suggested that defendants have failed to cite a single case where any Court relied on a reissuance declaration or statement to constitute a disclaimer.

Defendants, if you have a case, let me know. But what I will say is, defendants did cite, and I went and read Aylus Networks, Inc. against Apple Inc., 856 F3d., 1353, and plaintiffs have the case cited on page 90 of the joint brief and they have a block quote.  And the block quote is accurate.  It's not taken out of context.  And it seems to me it makes clear that the Federal Circuit believes that representations made to the Examiner to reissue a patent, to limit the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to allow claim allowance, and therefore I think the defendants have met their burden to establish that there was a clear and unmistakable disclaimer.  I'm going to adopt the defendants' construction for the disputed term.

MS. WIGMORE:  Your Honor, may I raise one issue?

THE COURT:  You can.

MS. WIGMORE:  With respect to their narrowing construction, as I mentioned at the beginning of my

presentation --

THE COURT: Wait a second. Before you do that, hold on. Stop. I think I know what you are going to get to and I just want to make sure I clarify my ruling before you comment. All right? No, I don't need to clarify it. Go ahead. Sorry.

MS. WIGMORE: So in terms of -- if I may approach, Your Honor?

THE COURT: Please.

MS. WIGMORE: Okay. The defendants' proposed construction that sought to read in a requirement that the composition be a crystalline monohydrate, but as we discussed, even the original claims did not require that they were pharmaceutical compositions prepared from a crystalline monohydrate. None of the claims ever required that the composition itself be a crystalline monohydrate.

THE COURT: I see.

MS. WIGMORE: So we do think that their proposed construction, even with Your Honor's ruling on the disclaimer, their proposed construction is too narrow.

THE COURT: So that's a fair point. So maybe I should hear argument on that. I'm not sure. Let's put it this way. Well, let me hear from the defendants then on that point.

MR. RAKOCZY: William Rakoczy for the

defendants, Your Honor.

Your Honor, I think that's a distinction without a difference. You're talking about a pharmaceutical composition that's prepared from crystalline monohydrate regadenoson and a carrier, so, of course, it has crystalline monohydrate in it. Now, is it possible that with the carrier, it could be in different forms? It could be a solution or it could be a suspension? Of course, that is possible, but I fail to see how this prepared from changes the analysis, and I might add, Your Honor, this is also somewhat of a new argument we're hearing. I think it was relegated to a footnote.

THE COURT: Well, 02 Micron, whatever that case you cite, it may be new because of something I've said that all of a sudden prompts something. I mean, let's try to get -- this is going to come back. It's a bench trial. Let's try to figure out the right way to go.

MR. RAKOCZY: Absolutely, Your Honor. I'm just saying it was in a footnote.

THE COURT: Yes.

MR. RAKOCZY: That is all I am saying.

THE COURT: Yes. I'm giving you a chance to talk about it and I will think about it.

MR. RAKOCZY: And I don't think that changes anything.

THE COURT: Right. So I mean, do the plaintiffs have an alternative proposal?

MS. WIGMORE: Yes, Your Honor. So, again, using the original claim language, which is prepared from a crystalline monohydrate, the construction that the defendants have proposed --

THE COURT: Well, I'm not asking what the defendants proposed.

MS. WIGMORE: I'm suggesting an edit to that.

THE COURT: Okay.

MS. WIGMORE: So they have said that it's 99 percent -- 99.6 percent pure crystalline monohydrate and, again, as the claims make clear, you can dissolve the material in a carrier, and when you are dissolving it, there's no requirement or indication that it would remain crystalline monohydrate. So the construction should be, 99.6 percent pure regadenoson prepared from crystalline monohydrate, and that would be as narrow as one could get based on the original claim.

THE COURT: The problem is this. As I see it, the proposal is claim 4 says that the crystalline monohydrate has to have a purity of 99.6 percent.

MS. WIGMORE: It's different language, Your Honor, in claim 4 versus claim 17.

THE COURT: Well, I agree it's different, but

your inventor swore under oath to the Patent Examiner that claim 17 is narrower in scope than claims 1 and 4, so that's the burden you have to overcome.

MS. WIGMORE:  Understood.

THE COURT:  And like I find all the time in patent law, it never works out perfectly.  The limitations to language, the fact that it's a historical document, it evolved over time.  I'm not seeing a way to fit everything into a perfect logical structure here.  Right?

MS. WIGMORE:  I understand, Your Honor.  I just want to make one point, which I think is very important from the potential infringement analysis.

THE COURT:  We shouldn't be thinking about infringement analysis right now in claim construction.

MS. WIGMORE:  But it's tied directly to the claim language.  So the defendants have argued that we are limited in scope to something that is narrower than the original claim.

THE COURT:  And you know what?  They've got a good argument on that.

MS. WIGMORE:  I understand Your Honor has ruled that way.  I just want to make --

THE COURT:  I want to make clear for the record, because this is one thing, frankly, I don't understand as a layperson.  Right.  I actually, I'm taking most seriously

the quote I read from the, is it Aylus?

MR. RAKOCZY: I think it's Aylus.

THE COURT: To me it's the significance of somebody swearing under oath to overcome an initial rejection to get a patent. That's why we have disclaimer.

Now, what I've seen in this case, I mean, I see it in other cases, but this is perhaps the most extreme where it's pretty obvious. I doubt whether there was any thought to the disclaimer. It was suggested by a Patent Examiner. By the way, it suggested that you might want to say this, which happens to be completely the opposite of the rationale for which you stated under oath you were pursuing reissuance. But, nonetheless, people fill out declarations I guess in patent proceedings all the time without a thought about that.

We do a 180 and the inventors now say, hey, it's narrower in scope. But that's what governs. That's the last statement they made under oath. That's the disclaimer. And it's clear and unmistakable by itself.

So the problem with your proposal, I will just state it. It doesn't give suitable weight to the language of the original claim 4.

MS. WIGMORE: Your Honor, may I propose an alternative?

THE COURT: Sure.

MS. WIGMORE: Which would be a pharmaceutical composition prepared from 99.6 percent pure crystalline monohydrate regadenoson, and that would be perfectly in line with --

THE COURT: But it's not perfectly in line, because the problem is claim 17 is very, very specific. We're talking about the resulting composition, and that composition has to comprise 99.6 percent pure regadenoson.

MS. WIGMORE: But none of the original claims contain the composition. This would be a serious deviation from those original claims.

There's no indication in the file history that was intended, and when the patent, the applicant said narrower, it is narrower.

THE COURT: See, here's the problem. He swore under oath it's narrower.

MS. WIGMORE: And it is.

THE COURT: Well, you can make an argument that it's not. The Patent Examiner didn't think it was. They thought, for instance, claim 1 was broader.

Your problem is your inventor was willing to say under oath. He was willing to say give me a new patent, I need a broader patent. He was willing to say because somebody suggested he get a new patent, it's narrower. That's the last thing he said. That's why we have the

patent. I'm going to go with that. I would just leave it with this. You can argue at the Federal Circuit.

The problem is there's no perfect way to reconcile all of the intrinsic evidence, but I'm going to give most significant weight to the statement under oath that ultimately led to the issuance or the reissuance, I should say, of the patent, and specifically the issuance of claim 17. Not a perfect world. The best I can do. That's how I'm going to construe it. I'm going to adopt defendants' construction.

Plaintiff, I'm going to ask you to submit within a week an order that both sides have looked at which reflect the rulings I've made today on the report. Is there anything else?

MS. WIGMORE: No, Your Honor.

MR. RAKOCZY: Nothing from defendants, Your Honor.

THE COURT: Thanks very much.

(Hearing concluded at 1:39 p.m.)

- - -